UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
B. LEWIS PRODUCTIONS, INC.,             :
                        Plaintiff,      :
                                        :       06 Civ. 6390 (DLC)
            -v-                         :
                                        :       OPINION & ORDER
MAYA ANGELOU,                           :
                        Defendant.      :
                                        :
----------------------------------------X

Appearances:

For Plaintiff:

Jethro M. Eisenstein
Profeta & Eisenstein
14 Wall Street
22nd Floor
New York, New York 10005

For Defendant:

Arnold M. Weiner
Barry L. Gogel
Law Offices of Arnold M. Weiner
2002 Clipper Park Road, Suite 108
Baltimore, Maryland 21211

Victor J. Rocco
Heller Ehrman LLP
7 Times Square
New York, New York 10036

DENISE COTE, District Judge:

    This diversity action concerns a dispute over whether the

defendant Maya Angelou ("Angelou") owes plaintiff B. Lewis

Productions, Inc. ("BLP") any portion of an advance she received

for drafting greeting card text.  Partial summary judgment was

granted in favor of Angelou on BLP's breach of contract claim by an Opinion and Order of August 10, 2007 ("2007 Opinion"). Angelou has now moved for summary judgment on BLP's sole remaining claim, fraud. Angelou's motion for summary judgment is granted. As explained below, when the plaintiff's misapprehension of the terms of a written settlement agreement could be easily corrected through a reading of either the agreement or the documents incorporated in it, the plaintiff is unable to show that its reliance on the defendant to clarify the facts is reasonable.

BACKGROUND

The following facts are undisputed or taken in the light most favorable to the plaintiff. On June 28, 2000, Angelou entered into a License Agreement ("License Agreement") with Hallmark Cards Incorporated ("Hallmark") to permit Hallmark to use language provided by Angelou in greeting cards and related products (collectively, "Hallmark/Angelou products"). The License Agreement provided in part that Hallmark would pay Angelou royalties ranging from five to nine percent on its net revenues from the sale of the Hallmark/Angelou products. It also provided for an advance of $1 million, payable on Angelou's execution of the License Agreement and "recoupable from royalties otherwise payable to" Angelou.

The License Agreement expired on December 31, 2004, and by letter agreement dated January 1, 2005 ("Amendment"), Hallmark and Angelou amended it and extended its term for four years, through December 31, 2008. Among other things, the Amendment increased royalty rates, so that Angelou would receive ten percent of net profits for the years 2006 through 2008. Hallmark also agreed to pay Angelou an advance of $800,000 "recoupable from royalties otherwise payable" to Angelou under the Amendment on the condition that Angelou delivered twenty-eight writings to Hallmark by April 15, 2005. Angelou promptly supplied the twenty-eight writings and Hallmark paid the $800,000 advance on February 22, 2005.

BLP is a company involved in the sports and entertainment business. It has been owned and operated by Ronald E. "Butch" Lewis ("Lewis") since 1978. The initial relationship between BLP and Hallmark is not described in the parties' evidentiary submissions, but BLP claims that in 1994 Angelou signed an exclusive agreement authorizing BLP to promote her writings for use in greeting cards. BLP claims that it subsequently obtained a license agreement for Angelou with Hallmark but that Angelou refused to execute the agreement. In 2000, BLP discovered that Angelou had entered into an agreement with Hallmark that excluded BLP. By a complaint filed in January 2001 and amended in September 2004, BLP -- represented by attorney Jethro

Eisenstein ("Eisenstein") -- sued Angelou and Hallmark for, respectively, breach of contract and tortious interference. BLP obtained a copy of the License Agreement and in 2002, Eisenstein's firm deposed Angelou, with Lewis in attendance. Angelou testified, _inter alia_, that "no document I have ever signed has been in my mind a complete document until there is an advance" and "any person who wants my work offers me an advance."

BLP settled its lawsuit against Hallmark in an agreement dated December 1, 2005 ("BLP/Hallmark Settlement Agreement") which specifically identified the Amendment and which linked future payments to BLP to Hallmark's revenues and its schedule of royalty payments to Angelou. The BLP/Hallmark Settlement Agreement provided for a lump-sum payment of $456,018.96 and quarterly payments going forward of 1.25% of "Net Revenues," made "on the same schedule as Hallmark pays royalties to Angelou pursuant to the License Agreement, _as amended_." (Emphasis supplied.) The third "WHEREAS" clause of the BLP/Hallmark Settlement Agreement similarly recited that "Hallmark and Angelou executed a License Agreement, dated June 28, 2000 (_as subsequently amended_, the 'License Agreement')." (Emphasis supplied.)

In the course of settlement discussions leading up to the BLP/Hallmark Settlement Agreement, Eisenstein, on BLP's behalf,

had twice requested via e-mail to Hallmark's counsel "up-to-date information" about Hallmark's sales under the License Agreement. Hallmark's replies identified the categories of payments to Angelou as royalties, advances, and guarantees. For example, in an e-mail reply on October 4, 2004, Hallmark's counsel stated that net sales "from inception through 2Q 2004 total $39,865,112.42," and that the "royalty/advance payments to Dr. Angelou during that period total $2,769,492.73." (Emphasis supplied.) The second e-mail reply on July 1, 2005 stated that net sales "from inception through 1Q 2005 total $44,318,102.73," and that "Hallmark's royalty/advance/guarantee payments to Dr. Angelou during that period total $4,310,724.46." (Emphasis supplied.) The $800,000 advance paid to Angelou on February 22, 2005 was included in the $4,310,724.46 figure. The first e-mail showed that Angelou had received payments amounting to just under 7% of Hallmark's net sales through mid-2004. The second e-mail showed $4.45 million in net sales and $1.54 million in payments to Angelou in the three most recent quarters. Thus, Angelou's earnings over those three quarters totaled nearly 35% of Hallmark's net sales. BLP, however, never asked Hallmark for a breakdown of royalty, advance, and guarantee payments made to Angelou.

About two months after the BLP/Hallmark Settlement Agreement had been executed, Angelou and BLP executed a

settlement agreement ("Settlement Agreement") dated February 1, 2006, with an effective date of January 12, 2006. January 12 was the day BLP and Angelou had executed a handwritten settlement agreement ("Handwritten Agreement"). In formalizing the terms of the settlement, the Settlement Agreement made several changes to the terms contained in the Handwritten Agreement. Among other changes, the Settlement Agreement altered the description in the Handwritten Agreement of the amounts to be paid to BLP in the future, from "2.75% of net Hallmark sales commissionable to Dr. Angelou at 9% and 1.22% of net Hallmark sales commissionable to Dr. Angelou at 4%," to "30.5% of all net funds paid to Dr. Angelou as royalties." The Settlement Agreement also explicitly referred to the Amendment. For example, the Settlement Agreement recited in its third "WHEREAS" clause that "Hallmark and Dr. Angelou executed a License Agreement, dated June 28, 2000, <u>as amended</u>." (Emphasis supplied.)

Under the Settlement Agreement, Angelou agreed to pay BLP $1 million in four installments. Clause 1(b) of the Settlement Agreement provided for additional payments to BLP based on royalties paid to Angelou following the effective date of the Settlement Agreement as follows:

> <u>Dr. Angelou shall pay to BLP sums equal to 30.5% of all net funds paid to Dr. Angelou as royalties</u> under the License Agreement [<u>i.e.</u>, the 2000 License

Agreement as amended in 2005] <u>after the effective date</u>
<u>hereof</u>, with respect to sales of products made by
Hallmark under the License Agreement from and after
January 1, 2006. <u>Dr. Angelou shall instruct Hallmark</u>
<u>to pay such sums to BLP on the same schedule as</u>
<u>Hallmark pays royalties to Dr. Angelou only if and</u>
<u>when the corresponding funds are actually paid to Dr.</u>
<u>Angelou</u> in accordance with the License Agreement, <u>and</u>
<u>from such funds only</u>. Dr. Angelou shall instruct
Hallmark to make such payments by check payable to B.
Lewis Productions, Inc. and sent to 250 West 57th
Street, Suite 311, New York, New York 10107-0001 or to
such other address as BLP shall designate in writing.
Dr. Angelou will not be responsible for any failure by
Hallmark to pay in accord with her instructions, and
any such failure by Hallmark to so pay will not be
deemed a breach hereof by Dr. Angelou. If,
notwithstanding such instructions, Hallmark fails to
so pay such sums directly to BLP, and instead pays
them to Dr. Angelou, then Dr. Angelou will promptly
remit the applicable sums to BLP. The parties further
agree that, in the event that the foregoing terms for
payment of sums equal to 30.5% of all net funds paid
to Dr. Angelou as royalties under the License
Agreement after the effective date hereof do not
comply with Hallmark's operational requirements for
accounting or payment of licensing royalties, the
Parties shall agree upon alternate language of
instruction to Hallmark consistent with Hallmark's
requirements that will allow for payment of the
payments agreed-upon herein to be paid to BLP without
changing the monetary amounts of such payments.

(Emphasis supplied.) The Handwritten Agreement had similarly

stated that the additional payments were to be made "to BLP when

otherwise payable to Dr. Angelou, from such funds only." The

Settlement Agreement also contains a clause titled "Additional

Representations and Warranties," which provides:

    a. <u>Final and Binding Agreement</u>. This Agreement
       supersedes the Handwritten Agreement and this
       Agreement and the documents referred to herein
       constitute the entire, final and binding

understanding between the Parties hereto, and no other statement or representation, written or oral, express or implied, has been received or relied on by any Party in entering in this Agreement.

b. <u>Understanding of Agreement</u>. Each Party understands and agrees to this Agreement and the terms and conditions contained herein, and has relied on his, her or its own judgment, belief, knowledge, understanding and expertise after having the opportunity for consultation with his, her or its own legal counsel concerning the legal effect of this Agreement and all of the terms and conditions contained herein. <u>No Party hereto has relied on any statement, representation or promise of any other party or</u> with any other officer, <u>agent</u>, employee <u>or attorney for the other party</u> in executing this Agreement except as expressly stated herein. In resolving any dispute or construing any provision hereunder, there shall be no presumptions made or inferences drawn because the attorneys for one of the parties drafted the Agreement, because of the drafting history of the Agreement, or because of the inclusion of a provision not contained in a prior draft or the deletion of a provision contained in a prior draft.

c. <u>Voluntary Settlement</u>. <u>Each Party enters into this Agreement</u> and any documents referred to herein, <u>knowingly</u> and voluntarily, <u>in the total absence of any fraud</u>, mistake, duress, coercion, or undue influence <u>and after careful thought and reflection upon this Agreement and any documents referred to herein</u>; and accordingly, by signing this document and the documents referred to herein, each signified his, her or its full understanding, agreement, acceptance thereof; and

d. <u>Investigation of Facts</u>. <u>Each Party has investigated the facts pertaining to this Agreement and all matters pertaining thereto as deemed necessary by each.</u>

(Emphasis supplied.)

When BLP did not receive any payment for the royalties earned by Angelou in the first quarter of 2006, it learned

from Hallmark that no royalties had been paid to Angelou because of the $800,000 advance provided in the Amendment. BLP then commenced this lawsuit -- in which it has again been represented by Eisenstein -- for breach of contract and fraud.  The 2007 Opinion addressed the breach of contract claim, concluding that "the Settlement Agreement does not require Angelou to pay BLP any percentage of the $800,000 advance she received from Hallmark almost one year before the parties executed the Settlement Agreement."  B. Lewis Prods. v. Angelou, No. 06 Civ. 6390, 2007 WL 2295971, at *2 (S.D.N.Y. Aug. 10, 2007).  Angelou now moves for summary judgment on the remaining fraud claim.


DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party.  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).

The parties agree that New York law governs their dispute. "In New York a plaintiff alleging fraud must show by clear and convincing evidence that the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result." Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 181 (2d Cir. 2007). "Where a defendant . . . seeks to show fraud by omission, it must prove additionally that the plaintiff had a duty to disclose the concealed fact." Id.

BLP asserts both that Angelou (1) fraudulently misrepresented the terms on which she was agreeing to settle with BLP and (2) fraudulently concealed the fact that she had received an $800,000 advance recoupable from future royalties. Among other things, BLP has not shown under either theory that disputed issues of material fact exist with respect to the reasonableness of its reliance on Angelou, and Angelou is therefore entitled to judgment as a matter of law on BLP's fraud claim.

I.   Fraudulent Misrepresentation

BLP contends that Angelou misled it into believing that the royalty-based settlement payments would begin immediately by materially misrepresenting the terms of the settlement in the early stages of negotiations.  Specifically, Lewis and

Eisenstein assert in affidavits that in early January 2006, soon after the BLP/Hallmark Settlement Agreement was executed,[1] Angelou's attorney called Eisenstein to offer "the same deal that Hallmark had made." Further, they state that when the parties met several days later on January 12, the day on which they executed the Handwritten Agreement, Angelou's attorney reiterated that offer. According to Lewis's affidavit, the settlement offer was again to make "the same deal that Hallmark had made with BLP," which "was a payment for the past and a percentage of royalties, starting immediately and continuing as long as the Hallmark-Angelou licensing agreement was in place." Lewis also states, "[Angelou's attorney] and I agreed that the royalty payments going forward would be made directly by Hallmark to me and would start immediately." According to Eisenstein's affidavit, the reiterated offer that was made in person was "to match the Hallmark settlement," which Eisenstein "understood . . . to mean that Angelou would make a lump sum payment to BLP for the past, as Hallmark had done, . . . and that Angelou would make a payment of 1.25% of Net Revenues to BLP, starting immediately and continuing for as long as there was a Hallmark-Angelou licensing agreement." The parties agreed, Eisenstein states in his affidavit, "that the payment to

---

[1] The BLP/Hallmark Settlement Agreement was dated December 1, 2005.

BLP would be made directly by Hallmark, out of funds then payable to Angelou." BLP argues that these statements were misleading and fraudulent because Angelou's attorney knew that Hallmark's substantial advance payment to Angelou would relieve Hallmark from paying any royalties to Angelou until it had recouped the entire advance.

Accepting as true the accounts given by Lewis and Eisenstein in their affidavits, BLP has not raised an issue of fact that BLP's reliance on these statements, which were made weeks before the parties executed the Settlement Agreement, was reasonable. To succeed on a claim of fraud, a plaintiff must "establish that it actually relied on the disclosure or lack thereof, and that such reliance was reasonable or justifiable." Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 156 (2d Cir. 1995). Under New York law, where there is "a 'meaningful' conflict between an express provision in a written contract and a prior alleged oral representation, the conflict negates a claim of a reasonable reliance upon the oral representation." Stone v. Schulz, 647 N.Y.S.2d 822, 823 (2d Dep't 1996).

The critical payment terms of the Settlement Agreement differ substantially from those of the BLP/Hallmark Settlement Agreement. As a result, BLP could not reasonably believe that it was making "the same deal" with Angelou that it had made with

12

Hallmark, or that Angelou's payments to BLP would begin

"immediately." The differences between the two agreements

include the measurement of payment and the dates on which

payment would begin. Whereas the BLP/Hallmark Settlement

Agreement provides that "[b]eginning with third quarter 2005,

Hallmark will pay to BLP a payment equal to one and one quarter

percent (1.25%) of Net Revenues as that term is defined in the

License Agreement," the Settlement Agreement provides that "Dr.

Angelou shall pay to BLP sums equal to 30.5% of all net funds

paid to Dr. Angelou as royalties under the License Agreement

after the effective date hereof." (Emphasis supplied.) BLP's

deal with Hallmark thus set future payments as a percentage of

net revenues beginning mid-2005, while its deal with Angelou set

future payments as a percentage of royalties paid to Angelou

after early 2006. Moreover, although the timing and the amounts

of Hallmark's payment of royalties to Angelou under the

Amendment may not have been directly relevant to the

BLP/Hallmark Settlement Agreement, those royalty payments formed

the express basis of BLP's receipt of money under its Settlement

Agreement with Angelou. Having entered into the written

Settlement Agreement with a future payment provision that varied

substantially from the equivalent provision in the BLP/Hallmark

Settlement Agreement, BLP cannot now claim that it reasonably

relied on oral representations to the contrary made during negotiation of the written agreement.

BLP's claim of reliance on the oral statements is also belied by the terms of the Handwritten Agreement, which was signed on the very day that Angelou's attorney allegedly made the second set of oral representations. The Handwritten Agreement specified that Hallmark was "to pay such amounts to BLP <u>when otherwise payable to Dr. Angelou, from such funds only</u>." (Emphasis supplied.) The BLP/Hallmark Settlement Agreement contains no such limitation on its payments to BLP. In sum, BLP has failed to present sufficient evidence to support a fraud claim based on oral misrepresentations.

II. Fraudulent Concealment

BLP further contends that Angelou committed fraud by failing to inform BLP that in 2005 she had received an $800,000 advance against future royalties. This omission was especially deceitful, BLP argues, in view of the misrepresentations described above that Angelou's attorney made to BLP when he called to discuss settlement in early January and when he met with Lewis and Eisenstein several days later. But BLP cannot prevail on its theory of fraudulent concealment because Angelou had no duty to speak of her advance and, in any event, BLP could not have reasonably relied on Angelou to volunteer that information.

a. Duty To Disclose

"A concealment of facts supports a cause of action for fraud only if the non-disclosing party has a duty to disclose." Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1483 (2d Cir. 1995). This duty "ordinarily arises where the parties are in a fiduciary or other relationship signifying a heightened level of trust." Id. When a party becomes aware, however, that another is "operating under a mistaken perception of a material fact," then it also has a duty to disclose if it has made "a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party," or if it "possesses superior knowledge, not readily available to the other." Id. at 1484; see also TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 91 (2d Cir. 2005). Nonetheless, if "a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud, assert it was fraudulently induced to enter in to the contract by the very representation it has disclaimed." Banque Arabe, 57 F.3d at 155 (citation omitted). But "even such an express waiver or disclaimer will not be given effect where the facts are peculiarly within the knowledge of the party invoking it." Id. (citation omitted).

BLP does not contend that Angelou made a partial or ambiguous statement that triggered the duty to disclose.

Rather, BLP relies on New York's superior knowledge exception, arguing that Angelou had a duty to speak because she possessed superior knowledge of the fact that under the terms of the Settlement Agreement she would not have to pay BLP anything beyond the initial settlement payment of $1 million until Hallmark had recouped from future amounts due in royalties the $800,000 advance it had paid Angelou nearly a year earlier. BLP further argues that Angelou, or her attorney, knew or should have known that BLP was acting on the basis of mistaken knowledge when it agreed to the settlement. It asserts that Angelou must have known that BLP did not have a copy of the Amendment since BLP did not correct the erroneous description in the Handwritten Agreement, which had been drafted by Angelou's attorney, of the rates at which Hallmark paid royalties to Angelou. Further, to discourage BLP from investigating the royalty rates, Angelou unilaterally revised the formula in the Settlement Agreement for Angelou's payments to BLP, by substantially increasing it to 30.5% of the royalties paid to Angelou and removing any description of the actual royalty rate. As additional evidence of Angelou's deception, BLP claims that when Eisenstein inquired of Angelou's attorneys whether the new formulation would be more difficult for Hallmark to administer, the attorneys instructed him not to call Hallmark, but stated that they would call instead. Angelou disputes these

contentions, arguing that she reasonably assumed that BLP had already reviewed the Amendment in the course of its earlier litigation and settlement negotiations with Hallmark.

Accepting all of BLP's assertions, BLP has failed to raise an issue of fact regarding its access to the allegedly concealed information.  It is undisputed that BLP could have discovered the $800,000 advance and its terms by reviewing the Amendment. BLP does not dispute that it knew the License Agreement had been amended, that the Settlement Agreement refers to the Amendment, and that, despite that knowledge, it never asked to see the Amendment.  BLP could have asked either Angelou or Hallmark for a copy of the Amendment, and admits in its opposition that it could have obtained the Amendment with a "relatively modest investigation."  Indeed, having chosen to refer to the Amendment in the Settlement Agreement, BLP is charged with knowledge of its terms.  Had it been unable to obtain the Amendment, BLP had a duty to safeguard itself by inserting protective language in the Settlement Agreement.  See Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1543 (2d Cir. 1997).  Thus, because the duty to disclose on the basis of superior knowledge arises only when the information at issue is "not readily

available" to the other party, BLP's fraudulent concealment theory fails as a matter of law.[2]

### b. Reasonable Reliance

Angelou is also entitled to summary judgment because BLP cannot prove reasonable reliance on Angelou's failure to disclose the terms of the Amendment to it. Any reliance by BLP on Angelou's lack of disclosure was unreasonable as a matter of law.

In assessing whether or not reliance is reasonable, courts consider the entire context of the transaction, "including factors such as its complexity and magnitude, the sophistication of the parties, and the contents of any agreements between them." Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003). "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." Crigger v. Fahnestock & Co., 443 F.3d 230, 235 (2d Cir. 2006) (citation omitted). Therefore,

---

[2] When it executed the Settlement Agreement, BLP expressly disclaimed reliance on any representation or promise by Angelou or her attorneys, represented that it had reflected on the documents referred to in the Settlement Agreement, such as the Amendment, and affirmed that it "investigated the facts pertaining to" the Settlement Agreement. These disclaimers of reliance and representations of due diligence also eviscerate BLP's fraud claim based on concealment.

> where the representation relates to matters that are
> not peculiarly within the other party's knowledge and
> both parties have available the means of ascertaining
> the truth, New York courts have held that the
> complaining party should have discovered the facts and
> that any reliance under such circumstances . . . would
> be unjustifiable.

Lazard Freres & Co., 108 F.3d at 1542 (citation omitted).  "Only

when matters are held to be peculiarly within defendant's

knowledge is it said that plaintiff may rely without prosecuting

an investigation, as he had no independent means of ascertaining

the truth."  Crigger, 443 F.3d at 234 (citation omitted).

Information is peculiarly within the other party's knowledge

"where a party would face high costs in determining the truth or

falsity of an oral representation and those costs are

sufficiently great to render reliance upon the representation

reasonable."  Warner Theatre Assocs. Ltd. P'ship v. Metropolitan

Life Ins. Co., 149 F.3d 134, 136 (2d Cir. 1998) (citation

omitted).  Even then, sophisticated business parties are charged

with an additional duty to protect themselves:

> Where . . . a party has been put on notice of the
> existence of material facts which have not been
> documented and he nevertheless proceeds with a
> transaction without securing the available
> documentation or inserting appropriate language in the
> agreement for his protection, he may truly be said to
> have willingly assumed the business risk that the
> facts may not be as represented.  Succinctly put, a
> party will not be heard to complain that he has been
> defrauded when it is his own evident lack of due care
> which is responsible for his predicament.

Lazard Freres & Co., 108 F.3d at 1543 (citation omitted) (emphasis omitted).

BLP argues it had no reason to suspect that an advance recoupable from royalties had been paid to Angelou under the Amendment, nor did it have reason to inquire about advances at all because the terms that Angelou allegedly offered in the early stages of settlement negotiations made any advances paid to her irrelevant. As he explained in his deposition, Eisenstein never asked to see the Amendment in the course of negotiating the settlements with either Hallmark or Angelou "because it was irrelevant to the settlement that we reached with Hallmark, and to the settlement that was proposed to us by Angelou."

Again, however, BLP does not dispute that it knew of the Amendment and could have obtained a copy of it with a "relatively modest investigation." It cannot substitute its lack of due care in obtaining a copy of the Amendment with the claim that it relied upon Angelou to disclose the terms of the Amendment to it. All of the circumstances surrounding the execution of the Settlement Agreement make such alleged reliance on Angelou unreasonable. The Settlement Agreement settled a substantial dispute with a sizeable payment of $1 million plus a potential stream of royalty-based payments. The litigation it settled was premised on allegations that Angelou had previously

acted dishonestly and in bad faith in depriving BLP of its share of monies due from Hallmark. Lewis himself testified at his deposition that he had a hostile relationship with the attorney who represented Angelou in that litigation. BLP, moreover, is a sophisticated party that represents athletes and actors in endorsement deals and contract negotiations, and, as such, should be familiar with the practice of providing advances recoupable from royalties. In addition, BLP was represented by experienced counsel in the settlement negotiations with Hallmark and with Angelou. Apart from the company's disputes with Angelou, Eisenstein has represented BLP in at least five other litigation matters.

Second, even without obtaining the Amendment, BLP was on notice that Hallmark had paid an advance to Angelou. The original License Agreement, which Lewis and Eisenstein had reviewed and which had expired over one year before the Settlement Agreement was signed, contained an advance of $1 million, similarly recoupable from royalties. Also, Angelou had already testified in her deposition, in the presence of Lewis, that every final contract she signs contains an advance. Moreover, the figures for Angelou's "royalty/advance" payments that Hallmark provided to BLP in 2005 showed a five-fold increase in Angelou's compensation as a percentage of net sales in a three-quarter period -- an increase that coincides with the

expiration and extension of the License Agreement. These figures gave notice to BLP well before it began its settlement negotiations with Angelou that she had been paid a large advance in 2005 in connection with the Amendment.

Third, BLP is unable to explain how it could responsibly neglect to review that Amendment. The Settlement Agreement states that BLP will only be paid going forward to the extent Hallmark pays Angelou "royalties." Any royalties paid to Angelou after the January 12, 2006 effective date of the Settlement Agreement would necessarily be dictated by the Amendment since the original License Agreement expired December 31, 2004. The Amendment, therefore, provided the starting point for the future payments provision of the Settlement Agreement. Indeed, the Settlement Agreement represents that the parties have carefully reflected on the documents referred to in the Settlement Agreement, which included the Amendment.

In sum, BLP is a sophisticated player who was on notice of the existence of the Amendment and its impact on Angelou's past and future payments from Hallmark. The Amendment was readily available to it upon the most basic investigation. In these circumstances, BLP has failed to raise an issue of fact that its reliance on Angelou's silence was reasonable. Angelou is entitled to summary judgment on BLP's fraudulent concealment theory.

The plaintiff's cases are inapposite. They involve a ruling on a Rule 12(b) motion, a willful misrepresentation, or circumstances where even the additional investigation suggested would not necessarily have revealed the truth.[3]

CONCLUSION

The defendant's January 7, 2008 motion for partial summary judgment is granted. The Clerk of Court shall enter judgment for the defendant and close the case.

SO ORDERED:

Dated:    New York, New York
          April 22, 2008

DENISE COTE
United States District Judge

---

[3] These cases are, respectively, Brass v. American Film Technologies, Inc., 987 F.2d 142, 152 (2d Cir. 1993), Todd v. Pearl Woods, Inc., 248 N.Y.S.2d 975, 977 (2d Dep't 1964), and J.P. Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 410 (S.D.N.Y. 2004).

23